# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

**NO. 03-05-00759-CV**

**In the Matter of R.M.**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. J-24,521, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

R.M., a juvenile, was adjudicated delinquent for possession of less than one gram of cocaine and, in a separate disposition order, was committed to the Texas Youth Commission for an indeterminate period of time. *See* Tex. Fam. Code Ann. §§ 54.03, .04 (West Supp. 2007). On appeal, R.M. contends that the trial court abused its discretion in committing him to TYC. We affirm the trial court's disposition order.

A trial court may not commit a juvenile to TYC unless it finds that commitment is in the child's best interest, all reasonable efforts were taken to avoid the need to remove the child from his home, and the child could not get the care, support, and supervision he needs to meet probation conditions in his home. *Id*. § 54.04(i)(1); *In re C.C.*, 13 S.W.3d 854, 858 (Tex. App.—Austin 2000, no pet.) (op. on reh'g). A juvenile court has broad discretion in determining the suitable disposition of a juvenile who has engaged in delinquent conduct. *In re A.I.*, 82 S.W.3d 377, 379 (Tex. App.—Austin 2002, pet. denied). In reviewing the court's decision on disposition, we ask whether the court acted in an unreasonable or arbitrary manner. *Id*. at 379-80.

A trial court does not abuse its discretion if some substantive and probative evidence supports its decision. *In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. App.—Fort Worth 2002, no pet.). Legal and factual sufficiency may be relevant in assessing the trial court's exercise of its discretion, and we review evidentiary sufficiency under the standards applied in criminal cases. *Id*. at 702-04; *see In re C.C.*, 13 S.W.3d at 858-59.

R.M. was almost seventeen on August 3, 2005, the date of the subject offense, and was seen out after curfew by a police officer. The officer spoke to R.M., who appeared agitated and fidgety, and saw R.M. drop a "white rock-like substance" into one of his pockets. The officer asked if R.M. had "weapons or anything" in his pockets, and when R.M. "plunged his hands down to his pockets," the officer decided to frisk him for weapons. During that search, the officer found the white object, which turned out to be crack cocaine, in R.M.'s pocket. R.M. testified that at the time of the search he was wearing his cousin's shorts because he had gotten dirty while visiting his aunt. He said the shorts were too big for him, so he "grabbed them and started holding them above [his] watch pocket." R.M. denied knowing that the cocaine was in the pocket or what it was and said he initially thought it was some kind of pill.

The trial court found that R.M. had possessed cocaine, adjudicated him delinquent for the offense, and immediately proceeded to disposition. R.M.'s mother testified that arrangements had been made for him to begin in an all-day work program immediately and that if he completed the program, he would graduate in two semesters. R.M.'s mother asked the court to place him on probation, saying that she would "[b]e more involved" and "start doing things with him more and making sure that he stay[s] away from negative peers and become more involved in his schooling."

According to R.M.'s probation department report and Jarrett Boykin, his probation officer, R.M. began his involvement with the department in October 2004, when he was taken into custody and charged with failing to identify himself. R.M. was adjudicated delinquent for that charge and placed on formal probation in March 2005. Boykin said that while R.M. was in custody for the subject offense, he was released on furlough to attend his father's funeral. While on furlough, he was involved in two altercations, including one at his former high school, where he "got loud" and belligerent until the school's police officer had to escort him off campus. Boykin said that before R.M. was taken into custody for the present offense, the department had planned to recommend that R.M.'s probation be terminated early so that he could go into the Job Corps. Boykin now recommended TYC custody, however, because he believed R.M. needed behavior modification due to an "extensive history" of combative and uncooperative behavior at school and with services offered by school and the department. Boykin believed R.M. might also need drug treatment but felt behavior modification was a more pressing need. Finally, Boykin said TYC would benefit R.M. because he "could use the supervision, some independent living skills." Boykin said R.M. was "very bright" but had a "defiant" attitude.

The trial court reviewed R.M.'s probation records, which reflect repeated outbursts at school and violations of school and probation conditions. Although his behavior improved for some time starting in mid-April 2005, when he was faced with placement in a more intensive program, the department reported that R.M. "did not perform well academically in the three classes" in which he was enrolled under a work-study program through which he was on campus for three hours and was supposed to work the rest of the day in exchange for school credit. R.M. did not

3

maintain employment during that semester of work-study. The report said that "[d]uring most of last school year, [R.M.] created constant disruption while [on campus] for three hours." R.M. was "sought out" by Children's Partnership, a service that matches juveniles with mentors in an attempt to improve their behavior, but he "spent his time cursing out teachers and staff as well as verbally abusing his mentor." R.M. was dropped from the Children's Partnership and the mentor program due to his refusal to participate. R.M. also failed to attend an anger management class that had been scheduled for March 2005. The report stated that R.M.'s mother was inconsistent, sometimes minimizing R.M.'s behavior problems and other times asking that R.M. be detained or placed in boot camp. R.M. had been detained six times for a total of fifty-six days from March 2005 through August 2005, and the report reflected that R.M. had been considered for three programs short of TYC commitment but was rejected from two because of "his age and a prognosis of success with peer redirection" and from one other "due to extensive history of non-compliance and refusal to work with programs." Although R.M. had been adjudicated delinquent only once before for misdemeanor failure-to-identify, the probation department recommended that he be committed to TYC, which was a deviation from the department's "progressive sanction level." Under the usual progression, R.M. would be at level four on the sanction levels, but the department recommended "a deviation to level six," which would call for TYC commitment. The department recommended that R.M. be committed to TYC "due to his consistent involvement in delinquent activities, and his refusal to participate in various services offered by multiple agencies within Travis County."

After hearing testimony and reviewing R.M.'s probation report, the court said that R.M.'s behavior shows "a pattern of pushing the envelope" and "not taking this seriously." The

4

court stated that "the behavior never changes. You never learn. It's never gotten better at school. It's never gotten better at home. Your mom is trying to do her part to help out. Things get better, and then they go south." The court said that R.M. was a "smart kid" who needed "more structure" and that his behavior had shown that placing him on probation at home was "not going to make a difference." The court ordered R.M. into TYC custody "to protect you from becoming an adult criminal, to get your attention—you can get your education, you can get your training, you can get drug treatment."

The evidence supports the trial court's observation that R.M. has a pattern of temporarily improving his behavior when faced with serious consequences, only to slip back into trouble. He was extremely disruptive at school, even though he was only on campus for a few hours a day, and in the spring of 2005, he stopped working despite being enrolled in a work-study program. R.M. was taken into custody six times in about five months time, from early March 2005 until the subject offense in early August, he had been recommended for the Job Corps or a GED program because of his poor performance in school, and the department believed his mother was inconsistent and tended to minimize R.M.'s problems. When released on furlough while in custody due to this charge, R.M. was involved in two different altercations. The court believed that R.M. needed more intensive supervision to give him support and to help him learn to control himself and made the findings required by section 54.04(i)(1) of the family code. When viewed in the light most favorable to the court's findings, the evidence is sufficient to show that TYC commitment is in R.M.'s best interest, that the department made all reasonable efforts to avoid removing him from his home, and that he cannot receive in his home the support, care, and supervision he needs. *See In re C.C.,*

5

13 S.W.3d at 858.  The same is true when all the evidence is viewed in a neutral light.  *See id*. at 859.  Although R.M. has shown that he is able to control his behavior when faced with serious consequences, he seems to slip back into misbehavior soon after.  He and his family made arrangements for a full-day work program that would put him on track for graduation the following spring, but he had been enrolled in a similar program in the spring of 2005 and did not complete those requirements.  We cannot hold that the trial court abused its discretion in determining that R.M. would be best served by being committed to TYC custody.   *See In re A.I.*, 82 S.W.3d at 379-80.  We affirm the trial court's order of disposition.

_____

David Puryear,  Justice

Before Chief Justice Law, Justices Puryear and Waldrop

Affirmed

Filed:   May 1, 2008

6